Case number 17-1415, Bradley Arndt v. Ford Motor Company. Ms. Lofbaum, you may proceed to the appellate. Good morning. Carol Lofbaum for Mr. Arndt. I would like to reserve three minutes for rebuttal, please. Mr. Arndt and I thank the court for their time and consideration. This is a fact-intensive case, but the analysis in any ADA failure-to-accommodate case like this one essentially boils down to this. Number one, is the plaintiff a qualified individual with a disability? Number two, is there a reasonable accommodation that the employer could have made to alleviate the effects of that disability? And number three, does that accommodation impose an undue burden on the employer? Absent an undue burden, there is a duty to accommodate. I want to briefly talk about whether the evidence shows, at least at a minimum, a fact question as to whether or not Mr. Arndt was qualified to work at Ford Motor Company with or without an accommodation. Let's look at what Ford put in writing. Mr. Arndt was successfully working as a process coach. He had two Achiever Performance Ratings. Contrary to what Ford argues in his brief, these reviews were not prior to his medical leave for PTSD. The second one was in January 2014. It was after his first medical leave for his unaccommodated PTSD, and it was during his second medical leave. This was put together by both of Mr. Arndt's supervisors, as well as a higher level, third level area manager, Mr. Sellers. They all signed off on this, confirming Mr. Arndt met or exceeded all his key objectives, quality, delivery, cost, morale, environment, safety. He was effective with respect to board one behaviors, which is essentially Ford's code of conduct. He, quote, consistently sets high expectations of his team members. So this is a solid review, and this is Mr. Arndt's second Achiever Rating at Ford, and this is without being accommodated. Continuing on, Mr. Sowers, his last supervisor, confirms he never observed Mr. Arndt having any difficulty with any job functions. Let's also look at what the plant doctor, Dr. Brewer, said about Mr. Arndt's qualifications to work at Ford. Recall that she has expertise with respect to PTSD, and specifically veterans like Mr. Arndt with PTSD. She looked at Mr. Arndt's resume when he brought his request to have the service dog. Strategic planning, logistics, material handling, leadership roles, financial forecasting, inventory management, dealing with vendors. She agrees his resume was impressive, and she said, we can find you something. It will be open to discussion. And recall Dr. Brewer also said she didn't find his request to bring the service dog unusual. She repeated that twice. Excuse me, let me interrupt, because a lot of what you're saying thus far really isn't in dispute. Isn't the core of this case an extended process that didn't deny his medical condition or anything of that nature? And whether the way that the thing ended was a result of Ford's just stringing it out to the point where he got frustrated and legitimately quit. That's kind of what it boils down to, isn't it? I agree with you, Judge. I wish I wasn't trying to argue about qualifications, but the trial court and Ford Motor Company both took the position that Mr. Arndt was not qualified, even with an accommodation, despite the overwhelming evidence in the record, including his own treater's testimony. He was very capable of performing this job. This is on summary judgment, isn't it? Yes. So if there is a question of fact as to his qualifications, we would not uphold a district court judgment of summary judgment on that ground. Absolutely. So getting to Judge Guy's question, should we move to the issue of whether Mr. Arndt terminated the interactive process? Because my understanding is that that might be the most critical question here. Okay. So I'm happy to address that. So Ford's records show that the initial accommodation request was made in February of 2013. Now, Mr. Arndt tried to retract it, but Ford's records very clearly said we're moving forward. There's a moving forward email from May of 2013 that makes no reference to any retraction. The problem is Ford never actually did anything to move it forward. Fast forward to May 2014, which is the day that my client in exasperation put his badge down and said, okay, enough is enough, you're just asking me the same questions over and over and over again. Can they do that? The company calls you in to ask you questions, and you just say, I've answered these before, I'm quitting? Well, I've cited several cases. I mean, in the abstract, no, of course not. They're entitled to interact. Why not? Because, and I've cited several cases, an employer can't just put this impermissibly high burden on a plaintiff that no matter what his answers are, it's not good enough. What they need to know is that he has a disability, and that there is a proposed accommodation that addresses that disability. I've cited several PTSD dog cases, Alonzo, Branson, Bagata. They all say the same thing. An employer does not engage in a good faith interactive process when they're continually asking the same thing over and over again. Continually ask the same thing? That justify just quitting? And then they're responsible for his quitting because they repeatedly ask him questions? Well, it shows. It's pretty obnoxious, but I mean, bureaucracy is out there. You know, if you ever call up the telephone, they ask you the same question over and over and over. If you want relief, you've got to answer it a few times. Right. But let me just give you an example of the superfluous information. Yes, it's obnoxious, but it also is beyond obnoxious because they have a duty to interact in good faith, and there's literally no evidence of good faith. There's a lot of evidence of stonewalling and really doing nothing. Ford admits that its entire interactive process with Mr. Arndt was two meetings, and according to Mr. Arndt, he was just treated in a belittling, disrespectful manner, and Ford made it very clear they had no interest in accommodating him. I want to read just a passage from the deposition of a Ford HR manager, and this is page ‑‑ this is Maria Ford Conliff, page 68 of her dep, which is in the record at page ID 3500. In March of 2013, this is questioned, in March of 2013, Ms. Roseman tells you as well as Ms. Beggs, Brad has a service dog that he has had for a year and a half that senses when Brad is going to have an anxiety or panic attack and keeps people at an arm's length from his location. I have attached the accommodation request, so you have the exact language Brad used in this request. If you turn to page two of the request, which is the last page, Mr. Arndt says, quote, here is a brief description of what my service dog can provide to me in the workplace, keeping in mind that this is a very short list of functions that he provides.  Then he is able to guide me and direct me to a quiet, calmer place. He is trained to keep people at arm's length from my location. He also watches behind me to keep people from startling me so as not to set off a trigger for me, provide tactile stimulation during intense moments of stress and panic, and watch my back. He also provides a great deal of comfort and security when he is near, thus giving me the utmost confidence to perform my job. Mr. Arndt provided that information to Ford, correct? Answer, I believe so. When did he provide it, do you know? He provided this information in early 2013, and that's just a little later in this passage, Judge. Question, and under the category of how the service animal helps him, he's giving a pretty detailed explanation of how the service animal helps him, correct? Answer, correct. Question, okay, so given that, do you know why 14 months later, according to this script, this May 13th script, the company now proposed to ask Mr. Arndt, how would a service animal help you to perform these functions? Answer, it's a legitimate question, and it's okay to ask again. Question, even though it's been documented for over a year in Ford records? Answer, sure. So, but in the interim, between that in 2013 and then 2014, there was a medical leave, right, for a substantial amount of time. So wouldn't it be reasonable for Ford to wonder whether the situation had changed in the course of a year? Yes, and as of April, Judge, they had all, they had this questionnaire from his treater, Dr. Lindsay Westfall, answering every question. No one at Ford said there was anything deficient about any of her answers. No one contacted her for follow-up. No one contacted the dog trainer. No one asked Mr. Arndt a single question about safe and health issues. Judge, why wouldn't they be able to ask those questions in the interactive meeting that they were having in May? Because in April, there's the questionnaire from the doctor who had answered all those questions, and nobody at Ford took the position that any of them were deficient in any way. So just on a similar vein, this May 13th meeting where my client turned in his badge, they also, after confirming repeatedly, Ford's not entitled to your entire medical record. We just need to know the PTSD diagnosis. They're now asking him on May 13th to provide any and all medical records. No matter what this man provides to him, it's not sufficient. They're asking for hundreds more pages, even though his PTSD diagnosis is confirmed,  PTSD essentially eliminates the effect. Nobody but a trained professional or Mr. Arndt would even know that he was experiencing any PTSD. It's like insulin to a diabetic. It takes away these symptoms and allows him to be. So on the basis of that, they shouldn't have even had the meeting? Should have just given him what he wanted? No, I think they should have sat down with him. I think they should have discussed concerns. According to Mr. Arndt, all they did was ask him repeatedly, and this is Ms. Humes, what can't you do, what can't you do, what can't you do? There's literally, it is documented in Ford records 10 times that he answered that question. If they sat down with him, they just shouldn't have started with a question that they already had answered. He just wanted a dialogue. I'm just asking what they should have done. What they shouldn't have done, according to you, is ask him that question. He can't quit just because you asked him that question once. So is it because you asked before that they can't ask it again? Is that the idea? I wouldn't say they can't ask a question more than once, but when it's documented in the records 10 times, and that's their lead-off question 15 minutes into the process, I don't think that's good faith, and I don't think that's moving the process forward. Thank you. Thank you. Good morning. May it please the Court. Eugene Scalia representing the Ford Motor Company. Mr. Arndt quit his employment, as he said, of his own accord. For that simple reason, his claim of constructive discharge fails, so does his claim that Ford failed to accommodate him in a job that he quit. This case really gets no more complicated than that, and I'll come back just in a moment to the meeting in which he quit and his constructive discharge allegations, but to address briefly the question of qualification. Judge Moore, you're correct that the Court does not need to address the question of qualification if he improperly quit, regardless of qualification. So this Court does not need to reach that issue. However, it would in order to hold for Mr. Arndt, and on the question of whether he was qualified, in a sense, that's what that meeting was about on May 13th. How was he going to do his job? Ford legitimately had questions in that meeting. In fact, the presentation you heard from his counsel shows you why they had questions and also shows you what remains unanswered. What you heard was that he did his job beautifully and he got good performance reviews. That naturally raised the question in Ford's mind, what parts of this job are difficult for you? That is the ---- Did Ford want to discharge him? It did not, and when he quit, they urged him to reconsider. They didn't want to discharge him at all. They did not. They had him on ---- Normally, if you have someone who can't do the job, you would discharge him, right? They were seeking to explore a possible accommodation. They were ---- I'm just asking you the one-two question. They didn't want to discharge him. That's correct. That means they thought he could do the job, right? They weren't sure. They were exploring that. That is what that meeting ---- They were exploring accommodations. I'm sorry? They thought they were exploring accommodations pursuant to his request for accommodations. They were, and they had a number of questions ---- Usually, this is the background, usually when you see this issue of whether he could do the job or not, that arises in cases where somebody has been discharged. And he says, well, you discharged me because I was disabled, and then they argue about that. Here you have a case where they wanted to keep him. It seems a little bit strange to get up and argue he couldn't do the job, but we wanted to keep him. By his own admission, he was unable to do that job without the dog there or some other accommodation. He makes some indications which you can interpret as saying he couldn't do the job, but the company's position during all this wasn't that he couldn't do the job until it got into litigation. Your Honor, Ford's position was to Mr. Arndt, if you're saying you can only do this job with the dog here, then we're going to need to explore whether that works. He had come to them and said, I want to come back. He'd been out for three months. He'd also been out for five months during that 13-month period from February 2013 to about April 2014. It wasn't a termination hearing, though. No, it wasn't. It wasn't a process that would lead to his not having the job. It was a meeting to determine whether it was possible to accommodate him, and Ford needed to understand how he was going to interact with that work environment. For example, there was automated equipment moving around. They wanted to understand how he was going to interact with that. There was a legitimate question how he was going to perform his job if the dog was going to pull him away from workplace conflict. You heard his lawyer read what he said in 2013 and reiterated in deposition, that the way the dog would accommodate him is that it would make a lot of noise and create a scene that would then excuse him from leaving the workplace in the event that he had. And all those arguments. I'm just asking. Those arguments were not Ford's position all along until litigation. Is that right? Your Honor, Ford didn't have a position. Ford's position was, we want to explore what's going to work here. We've got an employee who's. You didn't have a position, then you didn't have that position if you didn't have a position, I guess. You didn't have a position that he wasn't qualified to do the work. There was all this, does he need the dog? Is the dog necessary? Your Honor, Arndt's position was, I can't do this job. I can't do it. I've missed five months. In the last 13 months, I have to have my dog here. Ford then said, if that's the case, we have to explore whether that works. And so Ford had been prepared to have him in the workplace without the dog, but it was he who said, I can't do it. Where did he say that? In his accommodation request that he submitted in 2014. The request says, I cannot do the job without my dog. I'm asking as a question. Yes. I don't know if it uses those precise words, but what he was saying was that he needed that accommodation in order to be in the workplace. That's why a reasonable accommodation is sought. My understanding of reasonable accommodations from some of our past cases is that often an employee will suggest one accommodation that he thinks is reasonable, and the employer will say, no, we don't think that's reasonable. We'll give you a different accommodation. So there's a migraine case, for instance, where somebody wanted certain accommodations, and the employer said, no, we're not going to give you that because that's disruptive, but we'll give you this other accommodation. So why isn't this case sort of like that? For a couple of reasons, Your Honor. First, we never got to that point because he quit. He cut the process short. But second, this court in Mobley, and I believe it's the Jourolski case, said there's no duty to propose an alternative accommodation, and here that would have been premature. They were still exploring. If the employer doesn't have a duty in this hypothetical situation, does the employee then say hypothetically that the employee says, I want this accommodation for my migraine. And the employer says, no, we can't do that because it interferes with our work. Would you say then that our law is that the employee must then suggest another accommodation? The Mobley and Jourolski case suggests there's not that obligation to the employer, but it doesn't matter here, Your Honor, because they never got to that point. And if I could talk about his quit. What he hangs his case on is three constructive discharge cases where this court held that there was a reasonable quit. But those were circumstances where the court was clear that the employee was in intolerable pain, that remaining on the job was actually causing a decline in their health, and the employer had indicated in one manner or another that it was not open to an accommodation. And so, for example, in the Smith-Henderson case, this court was at pains to say this is different from a case where an employee quits prematurely out of apprehension that things may not improve. That just doesn't fit these facts at all. He was being accommodated through paid leave, which Hankins, this court said, was an accommodation while Ford explored this issue. And so, Judge Rodgers, to the questions you had for plaintiff's counsel earlier, this is really extraordinary. The interactive process meeting is meant to share information. The dialogue that you and I were having, the dialogue that was had with the plaintiff's counsel, is about what is the medical condition here? What is needed? How will we fix it? And he cut that meeting short literally at the first question. Now, in these interactive... which seems at least questionable. But if we get to the argument that he cut it short, their argument is that he just reached the end of his rope when he'd just been run around the mulberry bush so many times. I mean, we can all sympathize with that. And at some point it becomes in bad faith. If the person just said... If you're trying to get relief from somebody and they just say the same pablum words and don't listen and just like talking to a machine that's set on repeat, you know, voice activate to this answer, the same answer over and over and over, that's the thrust of their argument, it seems to me. What's wrong with that argument? What's wrong with that argument is it's not what happened. First of all, he withdrew his 2013 accommodation request. He said, orally, I want to withdraw it. They said, please continue, but if you're going to withdraw it, retract it in writing. He did so. They then followed up with an e-mail to verify and said, you know, to continue we would need medical information. He never provided it. And he then resubmitted a new request in 2014, and he testified in deposition both that he withdrew his request in 2013 and why he did so. So it's just not credible or reconcilable with the record that his request remained in place. Your opponent said during this argument that he provided all of the PTSD medical records and that Ford was asking for other medical records. That's incorrect, Your Honor. Ford did not receive any medical records until 2014, specifically on April 5, 2014. But at that point, did he not provide the PTSD-related medical records? In April 5, 2014, and they met with him on May 13th. And, by the way, he sent an e-mail on May 10th which said at four different places, you are encouraging me to participate in the accommodation process. That's 89-2 is the exhibit. And he said, again, I withdrew my earlier request. It is just not possible in this record to find that the request was submitted prior to February. Then there were these questions. To try to get back to my question, the point that I got from your opponent was that he did provide the medical records, Ray, the PTSD, and you say as of April 5th. So why should they be asking for further medical records? Like, say he had a toenail infection. I don't know that they never asked him about further medical records in the media. Okay, so that was enough, the medical records that he did provide on you? For additional questions, I'll give you an example. The doctor said the dog can stay at his workstation. But he had a job that involved being around on the floor of the plant. He was a plant manager. He supervised nine people. He had to make sure equipment was running. He couldn't just sit at his desk all day. So there was a question right there. The doctor says keep the dog at the desk, but what about going on the plant floor? That was unresolved. These were the kinds of things. Again, the interactive process is meant to be a dialogue. It's meant to be sharing information. It would sharply undermine that process if a participant who was involved didn't like a question and decided that they could just quit and stop the process. Like any discussion, exchange of information, negotiation, sometimes people hear things. He never responded to that question before? He had answered it, but first of all, it's the central question, how are you limited in your job? I understand. And he admitted that after he told Ford, not to his own satisfaction.  He had tried to answer it, and the doctor tried to answer it. It was asked the same question, right? And all of the answers she gave. All the answers are sort of vague. They say, well, he needs this because, rather than this is what he can't do. That's right. The answers are vague. And they ask him again, and the same problem arises, and I can see why it arises. You're talking about one question arises from a rubric or a set of analysis, and the first question is, what are your tasks and can you do them? That's right. And he's got a concern that's a little bit broader. It's like I do a whole range of things. I can do them all, but every once in a while I'm dysfunctional because I get hit with this memory, all right? And it seems like I can understand the frustration of someone who says, look, I can do all of my tasks, but every once in a while I get discombobulated, and this dog will keep me from getting discombobulated. Then they say, what tasks can't you do? And he says, I can do all of my tasks, but every once in a while I get discombobulated and this dog can prevent me from getting discombobulated. Then they sit him down and say, what tasks can't you do? It's pretty frustrating. And you say, well, they never did get the information they wanted. Well, yeah, because it doesn't fit in with their framework. Your Honor, if an employer is frustrated with the employee's answers, can it stop the accommodation process? No. And likewise, if an employee is frustrated, it can't stop it. And if you rule an employee may, that will be a radical change for an employer and employee obligation. So what should he have done if he feels he has given the same answer consistently to this question, what tasks can't you do, and he's being asked this at the May 13th meeting? It comes back to Smith-Henderson and not prematurely assuming that things won't improve. So what should he have done? He should have answered the question to the best of his ability. With the same answer that he had given previously. And then let Ford proceed to all the other questions that an employer in this circumstance, you could never determine on this record that you could put this person in the workplace. You read the doctor's records. This doctor was very concerned about this person's feelings of violence. He himself spoke to them repeatedly to his doctor. They were very serious questions. Now you're going back to whether he's qualified or not. I'm going to the serious questions that were to be explored. If you don't like the first one, just move on. If you rule that you can cut short the interactive process just because you don't like a question or two. Could he have said, I've answered that question before, and then just sat there? He could have done that and had them give the next question, and they would have had to determine based on that whether they had the information. And what if Ford said, well, if you don't answer this question, we're not going to be able to go forward on this? That would be a different case. Because then wouldn't Ford then be, in effect, terminating the interactive process? If I could modify the facts slightly. If Ford said, we will fire you if you don't answer the question, you're right. But that's not what happened. He should have sat the meeting through. Again, back to constructive discharge. This case, again, we've talked about qualification. Put it aside. He has nothing to sue on if he quit his job absent constructive discharge. And there's no way the facts here can be reconciled with this Court's constructive discharge jurisprudence. If you were to hold that you've been constructively discharged, if you don't like a question you were asked and can quit your job and sue, it would radically transform the wrongful termination cases you would have before you. But that's not the way you phrase it. You could say we could hold much more narrowly, conceivably, that if you asked a question which a jury could reasonably conclude showed bad faith and refusal truly to interact, then they can't just accept the firing. I mean, you phrase it in a very broad way. We wouldn't have to do it that broadly. Judge Moore, if I could answer that. Judge Rogers, the implication of that is whenever an employee or an employer don't like one or two things that are said during the interactive process, they can chop it off and either fire the employee or sue. We would hold that. We would hold instead whenever that happens and it shows that there's bad faith, then, all right, not whenever the employee decides he doesn't like a question. Anyone can decide they don't like any question. They'd have to show that it showed bad faith. I guess if they asked it 38 times, that would be a pretty good sign of bad faith, wouldn't it? And I would refer you to the Lausauget Fifth Circuit decision, which I think a ruling of that nature would create a conflict with because in Lausauget, the court spoke about how it's wrong for an employee to prematurely cut things short, which, among other things, puts the court. That's all fine, but it's not answering my question. Finally, Your Honor, again. If you're answering his question otherwise. To the extent your question is what had preceded it. You're saying it's true, isn't it, counsel, that they are not asking the court to say if you don't like a question, the interactive process is at an end. Instead, they're asking us to say, not that we agree with it, but let's get the question straight. It's not a question I don't like ends the interactive process. It's a question that shows bad faith ends the interactive process. Maybe that's not even enough, but it's a different question than the one you're saying is presented to us. Your Honor, what they are saying, first of all, is they are misrepresenting the status at that point. The court had only had the medical records for a month. And second, Your Honor, what they're saying is that in the very meeting intended to get at how to solve a problem, an employee can take offense and quit and sue, which undermines the interactive process rather than furthering it. Thank you. Thank you. In Mr. Arndt's 2014 renewed accommodation request, that's what the company has deemed at the renewed request, he doesn't say, contrary to Ford's counsel's representations, that he couldn't do the job. That is not in there. I also want to point out that months before the May 13th meeting where Mr. Arndt turned in his badge, the plant doctor put in writing, this is in the docket, page ID 3292, that she had medical records, the diagnosis of PTSD is supported. In ADA cases, a very important premise is that you make an individualized inquiry. No one wants the court to make broad, sweeping pronouncements on any of these issues, but the fact is the trial court got it wrong in this case with respect to this plaintiff. The trial judge relied on a Ford privilege log of withheld e-mails of unknown content as support for his finding that Ford must have been working diligently to accommodate Mr. Arndt. In fact, Judge Borman said they communicated weekly to address his complaint based on a log of withheld e-mails. So how so? I mean, these e-mails could have easily have said, let's stall, let's do nothing, we don't want a veteran with PTSD in the workplace. You know, we don't know that because those were withheld. They certainly can't rely on privileged withheld communications to say we did our job, we investigated, we were in good faith working forward. On the issue of whether or not Ford wanted Mr. Arndt to resign, that's not required for constructive discharge, but there is evidence that that's exactly what was happening. Remember, the very same individuals who Ford says were working to look into this ADA accommodation request were scouring his attendance records, looking from day one, from 2012, 10 people at Ford. Nobody at Ford could explain this except this was in the same time frame where they had solicited my client's replacement and had him in place when they knew that Mr. Arndt's return to work with a medical restriction of the service dog was imminent. I asked one of the Ford witnesses, she's a benefits specialist named Ms. Shatra, why was the company scrutinizing his records? The only explanation I got was, well, we had to know what his FMLA entitlement was. So that's a 10-person team effort. What Ms. Shatra said was, well, to calculate that, I would have gotten out a 2014 calendar and calculated 12 weeks from January 1st and come up with the date of March 26th. That's when his FMLA leave would have expired. So literally a one-minute calculation. We have a 10-person Ford team investigating, digging, not interacting with Mr. Arndt about his accommodation request, but behind the scene talking about his replacement, talking about his attendance, literally putting in writing, I found this in my archives, does this help? There's overwhelming evidence of a lack of good faith. And your red light is on. Would you indulge me in one question? Please. I had a question, but I didn't want to intrude on your time answering your question. You're both arguing, as indeed good counsel always does, all of the technical points of our cases and whatnot, but for me this case, context is everything. And it's unusual in that the typical case is somebody has a job that requires two hands and one hand gets injured and they say, give me a one-handed job. And if they find it for him, then that person is going to be able to do that on a regular basis. In this case, the accommodation, for me, calls into question his qualifications because when he has these episodes, for example, one, he was off five months. What if the dog didn't alert for him that day? After all, it's a dog. And as far as some of the things that were required to keep people away from him, a pit bull, I guess, would do that without any training, but I'm not sure Ford wants that kind of thing going on on the floor. It's so nebulous that you can understand why it would be something that an employer would have to wrestle with because everybody is liability conscious. On one hand, you've got a veteran, a very deserving veteran that they're trying to help. On the other hand, you have all sorts of liability questions on the other hand. And that seems to me what's just not being talked about in this case. So, Judge, I agree. I think everyone agrees that there were some concerns that had to be diligenced. The problem is, no matter how much Inc. Ford's bill is talking about, we had to do A, B, C, and D to investigate. There's literally nothing in the record that that actually happened. Let me talk about the Keith case, the Sixth Circuit case, very briefly. It was a deaf lifeguard who applied for a job with Oakland County. The trial court threw out the case saying, you're not qualified. You know, you're deaf. These accommodations you propose don't guarantee that you're going to be able to do the job. This court reversed, saying, you know what, you cannot hold a disabled person to a higher standard than a non-disabled person. In other words, prove conclusively, certainly not at the SJ stage of a case, that you would have been able to perform your job perfectly and never required a medical leave, had we accommodated you. I mean, Mr. Arndt was entitled to take medical leave. The FMLA requires it. Ford Motor Company, this is not a mom-and-pop operation. They had all kinds of positions they could have explored for him. They have generous leave policies. And one other very important thing is, the trial court essentially was dismissive of the psychiatrist hired post-litigation or during the litigation by Ford, who said, there are a lot of options we could have explored for Mr. Arndt. Everyone agrees an office setting was really not, would have basically been a non-issue for the dog. So let's explore options. Let's sit down and talk. Let's not just keep spinning our reels and making Mr. Arndt feel like he's a nuisance and somebody that doesn't deserve to be a productive worker. Thank you. Thank you both for your argument. The case will be submitted. Would the clerk call the next case, please.